UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

**MARY L. "NICKI" M. BOLAND**                                                                     **PLAINTIFF**

**VS.**                                      **CIVIL ACTION NO. 3:17-CV-803-LG-RHW**

**MISSISSIPPI DEPARTMENT OF PUBLIC SAFETY**            **DEFENDANT**

<u>**DEFENDANT'S REBUTTAL IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT**</u>

The Mississippi Department of Public Safety ("DPS"), by and through counsel, submits this Rebuttal in Support of its Motion for Summary Judgment, pursuant to L.U.Civ.R. 7(b)(4), and would show unto the Court as follows:

**1.**      ***Legitimate, Nondiscriminatory Reasons***

In support of its motion for summary judgment, DPS pointed to the numerous reasons cited by Commissioner Marshall Fisher for his decision to terminate the employment of Boland.

        A.      *Incident at the Capitol*

Boland shrugs off the incident where she admittedly told a judge that he did not know what he was talking about in the middle of a legislative committee meeting. *[28-1], Boland Deposition, p. 81*. However, this was not insignificant to Commissioner Fisher or DPS. In fact, as a result of this incident, Commissioner Fisher issued a memo stating that no DPS employee communicate with the legislature regarding DPS business without approval of their Division Director. *[28-1], pp. 79-80; Exhibit 2, Fisher Memo; Exhibit 3, Boland Acknowledgment*.

### B. Judicial College Presentation

Prior to the termination of Boland's employment, Boland made a presentation at the Mississippi Judicial College. *Fisher Deposition, [28-2], p. 32*. Former Supreme Court Justice Bubba Pierce subsequently reached out to other counsel at DPS and asked that Boland not be sent back to make other presentations. *Id*. As Fisher recalls it, Pierce characterized the presentation as "something like . . . a disaster." *Id*. Boland testified that she reached out to Justice Pierce after her termination, and that he told her that it was "no big deal" and that Boland "could have gone ahead and done" the next presentation. *Boland Deposition, [28-1], p. 83*. In fact, Justice Pierce stated that Boland had received the lowest evaluation scores of any speaker at the conference, and he specifically requested that someone else be sent instead of Boland for the next presentation presentation. *Exhibit 4, E-mail Exchange*.

Boland asserts in her response that nobody ever mentioned anything to her about there being an issue with her presentation. However, after learning about the issue with the presentation, Jim Younger withdrew permission for Boland to speak at a subsequent conference. *Younger Deposition, [31-4], p. 17; Exhibit 5, Younger E-mail to Boland*. This was one of the factors considered by Commissioner Fisher in terminating Boland's employment. *[28-2], pp. 32-33*.

### C. Treatment of Rusty Fortenberry

Commissioner Fisher also testified that former DPS Commissioner Rusty Fortenberry told him that Boland had been "very confrontational" toward him in a DPS meeting and that "he had never been treated that way before anywhere at any time, and he was not happy about

it." *Fisher Deposition, [28-2], p. 41*. Regardless of Boland's recollection of what occurred in the meeting, this is what was reported directly to Commissioner Fisher by former Commissioner Fortenberry.

Boland asserts in her response that DPS is procedurally prohibited from asking for summary judgment on Boland's claim that she was discriminated against because she is a white female. However, DPS requested in its motion "summary judgment as to all claims against it herein, and for an Order dismissing the Plaintiff's Complaint with prejudice." [28], p. 2. Furthermore, even if the Court finds that Boland is a member of three protected groups, the arguments and analysis offered by DPS in support of summary judgment apply to all three. DPS has offered legitimate, nondiscriminatory reasons for the termination of Boland's employment. Boland has been unable to demonstrate that these reasons are pretextual. Summary judgment in favor of DPS is appropriate as to all claims of discrimination asserted by Boland.[1]

## 2. *Ray Sims*

It is Boland's intention to make Ray Sims the villain of her story. Her brief begins speaking of Ray by opining that it was "obvious . . . that Ray Sims only wanted blacks working for him at PSP.[2]" *[32], p. 5*. Asked in her deposition what led her to this conclusion,

---

[1] A second lawsuit has now been filed by Boland in the Southern District regarding the termination of her employment. *Boland v. Fisher, et al.*, 3:18-cv-718-DPJ-FKB. In her new complaint, Boland asserts that she was fired, not due to gender or race discrimination, but in retaliation for her exercising her First Amendment rights in the meeting with NHTSA representative Sam Sinclair. *Id*. This is inconsistent with Boland's position in the instant matter that she "was fired because of Ray Sims' animus against white females." *[32], p. 14*.

[2] PSP stands for Public Safety Planning.

Boland stated that "[i]t was just his attitude in general." *[28-1], p. 36*. When asked if she could give any examples, Boland responded, "No. He fired four white women." *Id*. Ray Sims was asked in his deposition about the other four white women at PSP who have been terminated by DPS since Ray became the director of PSP. He provided information regarding the circumstances of each termination.

Boland asserts in her brief that "Ray Sims would talk abusively to the white women working under him." *[32], p. 5*. This statement is not supported by the evidence cited by Boland. In her deposition, when asked for factual information to support her allegation that Sims "fired" the other white women because they are white women, Boland simply stated, "[t]he way I heard him talk to women, the things he said to me about white women." *[28-1], p. 47*. When asked to clarify what she meant by "the way he talked to white women," Boland testified that "Ray thought he knew more than everybody else and was not willing to take their suggestions and their expertise and their knowledge." *[28-1], p. 48*.

    a.    *Penny Corn*

Penny Corn's employment with DPS was terminated by former Commissioner Albert Santa Cruz. *Ray Sims Deposition [31-10], p. 7; Penny Corn Deposition, [31-11], pp. 10-11*. When asked why Corn was terminated, Sims testified as follows: "Well, I can only tell you what I turned in. I turned in a statement that she was recording me, and she also told Brenda Thames that she was recording me, and so I turned that over to the commissioner." *[31-10], p. 7*. Corn did not testify that the termination of her employment had anything to do with her race or her gender. *[31-11]*. Nobody other than Boland herself has made that assertion. In

fact, as noted by Boland, Corn filed a lawsuit against DPS, former Commissioner Santa Cruz and Commissioner Fisher challenging the termination of her employment. *[31-14]*. While Commissioner Santa Cruz is sued in his individual capacity pursuant to 42 U.S.C. §1983, Ray Sims is not named as a defendant. *Id*. There is absolutely no mention of race or gender as a motivating factor for termination in Corn's lawsuit. *Id*.

  b.  *Twyla Jennings*

Former Commissioner Santa Cruz terminated the employment of Twyla Jennings upon Ray Sims' recommendation. *Sims Deposition, [31-10], p. 12*. Asked why Corn was terminated, Sims testified as follows:

> Mismanaging grants. She tried to push through two reimbursements without proper documentation. She also had UMC start a grant without application on file, and she gave them a grant agreement. UMC sent the documentation – the e-mail and the text message – showing that she gave them authority to start. Our policy states that you cannot begin a grant unless you have an application on file first and then a grant agreement.
>
> Also, she tried to supplant one of the grants with – the IT grants with Brian Jones from NHTSA and terminated the – told them that we could not do it. So what happens with that situation is if a grant is 100,000 or more, we have to send it to NHTSA for approval, so she tried it twice. Brian Jones rejected it and said this would be supplanting if you allow the grant. So what she did was she lowered the grant to like, I think, 80-something, and that way it wouldn't have to go to NHTSA. We're on high risk, so anything over 100,000 has to go to NHTSA, so she tried to push that through.
>
> Helen approached her -- Helen Porter approached her about it, and she said that she – she did an e-mail, and she said, you know, for me to approve this; Brian Jones has denied it twice. This would be supplanting.
>
> And so that was – that was another issue that she did. So it was several mismanagement of grants. And we had just had the state auditors in that office complaining about us doing those type of things, so it was mismanagement.

*Sims Deposition, [31-10], pp. 10-12*.

Jennings is also a plaintiff in the lawsuit mentioned above against DPS, former Commissioner Santa Cruz and Commissioner Fisher. *[31-14]*. Corn and Jennings are represented by able counsel in that matter and advance various theories of recovery in their lawsuit. *[31-14]*. However, their complaint makes no mention whatsoever of Ray Sims or any allegation that their termination was motivated, in whole or in part, by race, gender or a combination of those traits. *Id*.

    c.    *Virginia Stubbs*

The employment of Virginia Stubbs was terminated after Stubbs' white female supervisor reported that she felt threatened by comments that Stubbs had made regarding a gun, and that she felt that Stubbs "threatened her with a gun." *Sims Deposition, [31-10], p. 14*. Even then, Ray Sims did not recommend that Virginia Stubbs' employment be terminated. *Id, p. 14*. In fact, he recommended that she receive some counseling following the events described above.

Asked how Ray Sims treated white females differently than he treated black females, Stubbs testified as follows:

> Well, I mean, he just, you know, goes all out, you know, and does what they ask him to do, you know; and then we would try to talk to him, you know, and he would, "Well, I'll think about it," and, you know, it never come to anything. You know, he doesn't listen to our decisions.

*Stubbs Deposition, [31-16], pp. 9-10*. Stubbs said that she believed that race played a part in her termination, "[b]ecause, I mean, they just wanted their race in there." *Id., p. 10*.

    d.    *Mary Lukens*

When asked about why Lukens' employment was terminated, Sims responded as follows:

> Her director sent a recommendation to us about her not doing any of her work. She stopped coming to work. She wasn't going out and monitoring her facilities. These facilities have to be reported to the legislature every quarter, and she wasn't doing any of her work at all. She just stopped.

*[31-10], p. 16*. Lukens testified that she felt that Ray Sims harassed her. When asked to state specifically how Sims harassed her, Lukens testified that he would "nitpick" her work and was "picky" when she asked for time off. *[31-18], p. 13*.

Ray Sims has served as Executive Director of PSP in August 2016, initially in an interim capacity and then later in a permanent capacity. *See Exhibit 1, Declaration of Sims*. Since Sims has been Executive Director, there have been eight (8) people who have either been terminated or subjected to a forced resignation. *Id*. Five of those individuals are white women, two are black women and one is a white man. *Id*.

None of the testimony or evidence offered by Boland in opposition to summary judgment is sufficient to lead a jury to reasonably believe that Ray Sims was biased against Boland because she is white, or a woman or a white woman. Of course, it was not Sims' decision to terminate Boland's employment. Rather, it was the decision of Commissioner Marshall Fisher. *Fisher Deposition, [28-2], p. 7*. Sims never recommended that Boland's employment be terminated. *Sims Deposition, [31-10], p. 18*. He did provide information to Fisher regarding Boland's confrontation with Sam Sinclair from NHTSA. *[28-2], pp. 9-10*. However, as Fisher testified, this was only one of many events/factors considered by Fisher,

from several different sources, when contemplating the termination of Boland's employment.

### 3.     *Disparate Pay Claim*

The Complaint in this matter, as amended, only seeks relief pursuant to Title VII of the Civil Rights Act of 1964. *[14], p. 2*. In her response to the pending motion for summary judgment, Boland for the very first time in this lawsuit mentions the Equal Pay Act. The Fifth Circuit has held that "[a] claim which is not raised in the complaint but, rather, is raised only in response to a motion for summary judgment is not properly before the court." *Cutrera v. Bd. of Supervisors of La. State Univ.*, 429 F. 3d 108, 113 (5th Cir. 2005) (citing *Fisher v. Metro. Life Ins. Co.*, 895 F. 2d 1073, 1078 (5th Cir. 1990)). Plaintiff asserts that "facts must be pled, not legal thories." *[32], p. 29*. However, a plaintiff "may not defeat summary judgment on the basis of a **theory** found nowhere in their complaint." *Johnson v. Thibodaux City*, 2018 WL 1804756, at *6-7 (5th Cir. 2018) (emphasis added).[3]

Boland's disparate pay claim is without merit regardless of the theory of recovery asserted. As noted in the initial brief of DPS, Boland was actually hired at a salary significantly higher than that of Robert Coleman, the more experienced white male attorney that she replaced. Boland incredulously asks this Court to disregard this glaring dagger to the heart of her disparate pay claim, opining that Coleman was hired twenty years earlier than she was and that "their was obviously a different pay scale in the department" at the time of

---

[3]Boland's counsel has been unsuccessful in such efforts on numerous occasions previously. *Wong v. Lighthouse Point, LLC*, 2017 WL 6028356, at *5 (N.D. Miss. 2017); *Knox v. PHC-Cleveland, Inc.,* 24 F. Supp. 3d 584, 591 (N.D. Miss. 2014); *Mitchell v. City of Tupelo, Miss.*, 2014 WL 4545764, at *3 (N.D. Miss. 2014); *Weems v. Lauderdale Cty. Sch. Dist.*, 2013 WL 5797329, at *12 (S.D. Miss. 2013); *Linzy v. Sara Lee Corp.*, 2012 WL 1190907, at *3 (N.D. Miss. 2012); *McNairy v. Chickasaw Cty., Miss.*, 2010 WL 2802074, at *7 (N.D. Miss. 2010).

Coleman's hiring. *[32], p. 33*. There is absolutely no evidence that there was a "different pay scale," in the department when Coleman was hired. Even if there were evidence of such, there is no evidence that Coleman's salary was capped based upon his initial salary. Frankly, such an implication is ludicrous. Jim Younger began his employment with DPS in 1993, four years prior to Coleman. *Exhibit 6, pp. 1, 6*. Yet Younger was making the highest salary of any DPS attorney. *Exhibit 6*. Boland herself received a $7,500 raise within her first year of employment at DPS. *Boland Deposition [28-1], pp. 19-20*.

Boland also asks the Court to ignore the fact that DPS paid two white female attorneys more than it was paying Jay Eads, a white male. Shannon Jones was hired on April 1, 2017, a few weeks prior to the termination of Boland's employment. *[28-6]*. Her starting salary was $106,000. *Id*. Lora Hunter was hired to replace Jay Eads. *Id*. Her starting salary was $95,000. *Id*. Both of these attorneys held the job title of "Attorney, Senior." *Exhibit 6, pp. 2, 5*. This is the "exact job title" held by of Boland, Trae Sims, Jay Eads and all other attorneys at DPS, which Boland notes as a factor to be considered. *[32], p. 31*; *Exhibit 6*.

Boland asserts that she was doing "substantially similar work" as Younger, Sims and Eads and that Jones and Hunter were "not in the same situation as Boland." *[32], pp. 31-32*. None of the attorneys were in the "same situation." The chart submitted by Boland in support of her response reflects that she was performing different types of work than were Sims, Eads and Younger. *[31-20]*.[4] DPS does not pay all of its attorneys the same salary, but it is clear

---

[4] The chart predates the employment of both Jones and Hunter. Hunter assumed the duties that Boland was handling after Jay Eads left DPS. *Deposition of Boland [28-1], p. 46; Declaration of Shannon Jones [28-6]*.

from the undisputed evidence in this matter, as discussed above and in the initial brief of DPS, that the salaries paid to DPS attorneys are not based upon those attorneys' gender, race or any combination of those factors. Plaintiff's disparate pay claim, whether under Title VII or the Equal Pay Act (barred), must therefore fail.

## *Conclusion*

For the reasons set forth in the initial memorandum brief and this rebuttal in support of summary judgment, all claims advanced by Boland in this matter should be dismissed with prejudice.

Respectfully submitted this the 17th day of December, 2018.

**MISSISSIPPI DEPARTMENT OF PUBLIC SAFETY, Defendant**

**BY: ATTORNEY GENERAL JIM HOOD**

BY: */s/ Benny M. May*
BENNY M. MAY (MSB #100108)

Office of the Attorney General
Civil Litigation Division
Post Office Box 220
Jackson, Mississippi 39205
Email: bemay@ago.state.ms.us
Telephone: (601) 359-3680
Facsimile: (601) 359-2003

## **CERTIFICATE OF SERVICE**

I, the undersigned, do hereby certify that I have electronically filed the foregoing with the Clerk of the Court using the ECF system, which will automatically send notice to any/all counsel of record in this matter.

This the 17th day of December, 2018.

                                             */s/ Benny M. May*