UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

MARY L.M. BOLAND                                                        PLAINTIFF

V.                                               CIVIL ACTION NO. 3:17-CV-803-DPJ-RHW

MISSISSIPPI DEPARTMENT OF                                DEFENDANTS
PUBLIC SAFETY, ET AL.

consolidated with

MARY L.M. BOLAND                                                        PLAINTIFF

V.                                               CIVIL ACTION NO. 3:18-CV-718-DPJ-RHW

MARSHALL FISHER, ET AL.                                        DEFENDANTS

ORDER

In April 2017, Plaintiff Mary Boland was fired from her job as an attorney for the Mississippi Department of Public Safety ("DPS"). Six months later, Boland filed two federal lawsuits, naming DPS; its Commissioner, Marshall Fisher; and her former supervisor, Ray Sims, as defendants. The claims at issue here allege that Defendants Fisher and Sims retaliated against Boland for engaging in protected speech and maliciously interfered with her employment at DPS. Fisher and Sims moved for summary judgment [43], and for the following reasons, their motion is granted.

I.      Background

Boland began working at DPS in October 2015. Boland Dep [43-1] at 11–12, 38. "Several weeks" before she lost her job, Bolen was asked to draft a request for proposal ("RFP") that solicited bidders for advertising contracts funded by grants from the National Highway Traffic Safety Administration ("NHTSA"). Boland Aff. [46-3] at 1. During that project, Boland learned that NHTSA believed Mississippi was issuing "ghost tickets" and that NHTSA might not

provide the grants as a result. Fisher Dep. [43-2] at 12–13; Boland Dep. [43-1] at 100–01. Boland later confronted an NHTSA representative, while the representative was meeting with Sims, about the allegation. She ask, "[W]hy did his fellow employee allege that Mississippi was guilty of wrongdoing." Boland Aff. [46-3] at 3; *see also* Boland Dep. [43-1] at 103. The parties dispute whether Boland asked that question within the scope of her ordinary duties or as a citizen regarding a matter of public concern.

There is no dispute that Boland's confrontation with NHTSA became heated. Though she denies raising her voice, she testified that the NHTSA representative "jumped up and went crazy and was screaming at [her.]" Boland Dep. [43-1] at 103. As a result, Sims asked Boland to leave. *Id.* Sims explained that after this incident he told Fisher what happened because he was concerned that the NHTSA representative "was going to go back and talk to his director, which he did. [Sims] ended up calling his director after talking to [Fisher] and . . . apologized to him if his staff person was offended in any kind of way." Sims Dep. [31-10] at 29–30.

Although Sims reported the incident to Fisher, Sims never recommended discipline. Fisher Dep. [43-2] at 8–10. Nevertheless, Fisher discussed what happened with his "executive counsel" and Jim Younger, a senior DPS attorney. *Id.* at 8; *see also* Younger Dep. [31-4] at 4. Fisher concluded that Boland should be fired, but not just for the NHTSA confrontation. Fisher Dep. [43-2] at 6, 8. Fisher says he also based the decision on Boland's "unprofessional conduct" at other times during her employment, including two incidents that generated complaints from judges. *Id.* at 6–7, 19. Boland did not dispute the other problems in her summary-judgment response.

Aggrieved by the termination, Boland filed two lawsuits: one alleging gender and race discrimination under Title VII, Pl.'s Compl. (3:17-CV-803) [1] ¶ 3, and one alleging First

Amendment retaliation and tortious interference with her employment, Pl.'s Compl. (3:18-CV-718) [1] ¶¶ 3, 13.  The Court previously denied Defendants' motion for summary judgment on Boland's Title VII claims, *see* Mar. 12, 2019 Order (3:17-CV-803) [35], and then consolidated the two cases, *see* Apr. 16, 2019 Order [40].  Defendants now seek summary judgment on the First Amendment and tortious-interference claims.

II.     Standard

Summary judgment is warranted under Federal Rule of Civil Procedure 56(a) when evidence reveals no genuine dispute regarding any material fact and the moving party is entitled to judgment as a matter of law.  The rule "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The party moving for summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Id.* at 323.  The nonmoving party must then "go beyond the pleadings" and "designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324 (citation omitted).  In reviewing the evidence, factual controversies are to be resolved in favor of the nonmovant, "but only when . . . both parties have submitted evidence of contradictory facts." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc).  When such contradictory facts exist, the court may "not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).  Conclusory allegations, speculation, unsubstantiated assertions, and legalistic arguments have never constituted an adequate substitute for specific facts showing a

genuine issue for trial. *TIG Ins. Co. v. Sedgwick James of Wash.*, 276 F.3d 754, 759 (5th Cir. 2002); *Little*, 37 F.3d at 1075; *SEC v. Recile*, 10 F.3d 1093, 1097 (5th Cir. 1993).

III. Analysis

    A. First Amendment Retaliation

Boland says Fisher fired her because she asked the NHTSA representative "why . . . his fellow employee allege[d] that Mississippi was guilty of wrongdoing." Boland Aff. [46-3] at 3. Believing that her question constituted protected speech, Boland now asserts a First Amendment retaliation claim under 42 U.S.C. § 1983. Section 1983 states that a person who, under color of law, "subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution . . . shall be liable to the party injured[.]"

Although a person who "enters government service . . . by necessity must accept certain limitations on his or her freedom," public employees, such as Boland, "do not surrender all their First Amendment rights by reason of their employment." *Garcetti v. Ceballos*, 547 U.S. 410, 417–18 (2006). Rather, "the First Amendment protects a public employee's [First Amendment] right, in certain circumstances, to speak as a citizen addressing matters of public concern." *Id.* at 417. In balancing public employees' First Amendment rights with their employers' interest in the "efficient provision of public services," *id.* at 418, the Supreme Court has held that "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline," *id.* at 421.

Accordingly, a four-part test applies when determining whether a public employee's First Amendment rights were violated under § 1983: (1) whether the employee "suffered an adverse

employment action"; (2) whether the employee "spoke as a citizen on a matter of public concern"; (3) whether the employee's "interest in the speech outweighs the government's interest in the efficient provision of public services"; and (4) whether "the speech precipitated the adverse employment action." *Wilson v. Tregre*, 787 F.3d 322, 325 (5th Cir. 2015).

Boland suffered an adverse employment action, but her case stalls at the second element—whether she spoke as a citizen on a matter of public concern. That "element triggers a dicey test that has evolved since the Supreme Court decided *Garcetti*[.]" *Walker v. Smith*, No. 3:15-CV-911-DPJ-FKB, 2019 WL 1781422, at *3 (S.D. Miss. Apr. 23, 2019). Earlier this year, the Fifth Circuit described those developments as follows:

> *Garcetti v. Ceballos* settled that "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." [547 U.S. at 421.] *Garcetti* left for later the line between citizen and public-employee speech. As relevant here, after *Garcetti*, we repeatedly held that employees speaking in discharge of job-imposed obligations to report wrongdoing did so as public employees—not as citizens. [Citation omitted].
>
> Clarity came with *Lane v. Franks*' holding that "[t]he critical question under *Garcetti* is whether the speech at issue is itself ordinarily within the scope of an employee's duties, not whether it merely concerns those duties." [573 U.S. 228, 240 (2014).] Under *Lane*, a general job-imposed obligation to detect and prevent wrongdoing does not qualify as an employee's "official duty" because "such broad [obligations] fail to describe with sufficient detail the day-to-day duties of a public employee's job." [*Howell v. Town of Ball*, 827 F.3d 515, 523–24 (5th Cir. 2016).]

*Anderson v. Valdez*, 913 F.3d 472, 476–77 (5th Cir. 2019), *reh'g denied*, 916 F.3d 404 (5th Cir. 2019).

When conducting this inquiry, there is no "comprehensive framework for defining the scope of an employee's duties in cases where there is room for serious debate." *Garcetti*, 547 U.S. at 424. Rather, "the proper inquiry is a practical one." *Id.* Accordingly, "job descriptions are not dispositive, . . . the fact that speech concerns the subject matter of employment is not

5

dispositive, . . . and . . . whether the employee expresses himself in the office is not dispositive[.]" *Gibson v. Kirkpatrick*, 773 F.3d 661, 667 (5th Cir. 2014) (citing *Garcetti*, 547 U.S. at 420–21, 424–25).

Boland's case is not one "where there is room for serious debate." *Id.* To begin, there is no dispute that Boland was working on an RFP for NHTSA-funded contracts when she learned that the agency might withdraw funding over concerns that Mississippi was writing ghost tickets. Boland Aff. [46-3] at 1–2. Preparing the RFP for those contracts fell squarely within the scope of Boland's ordinary job duties because she was responsible for handling "state leases and contracts" and advocating for "public policy governing federal and state programs." Job Announcement [43-3] at 1.

Boland likewise acted within the scope of her ordinary job duties when she asked the NHTSA representative "why . . . his fellow employee allege[d] that Mississippi was guilty of wrongdoing." Boland Aff. [46-3] at 3. Those duties included "[c]onfer[ring] with federal agencies concerning federal regulations, procedures *or issues affecting the state and/or the agency*." Job Announcement [43-3] at 1 (emphasis added).

Boland disputes that point, claiming that Sims previously told her not to speak with NHTSA. Pl.'s Mem. [47] at 5. But there is no dispute that Boland confronted the NHTSA representative during a meeting Sims allowed her to attend. *See* Sims Dep. [31-10] at 28; Boland Dep. [43-1] at 102. Indeed, Sims testified that he motioned Boland into the meeting when she walked by, and there is no contrary evidence. Sims Dep. [31-10] at 28; *see also* Defs.' Mem. [44] at 4 (citing Boland Dep. [43-1] at 102 (testifying that she could not remember whether Sims "motioned" her into the room)). Finally, and most significantly, Boland testified that she sought and received Sims's permission to ask NHTSA the question upon which she bases her claim.

6

Boland Dep. [43-1] at 102–03.  Communicating with federal agencies like NHTSA was part of her ordinary duties.

Finally, the undisputed evidence proves that the specific question Boland asked the NHTSA representative fell within the scope of her ordinary duties.  Boland feared that NHTSA's accusations might jeopardize the NHTSA-funded contracts for which she was drafting the RFP; as Boland put it, "there was no way that [she] could prepare the RFP" without information from the NHTSA representatives.  Boland Dep. [43-1] at 95.  She also testified that she needed to talk to the NHTSA representative because she "was just still trying so hard to get that RFP . . . prepared[, a]nd there was no way [she] could get that contract prepared without understanding what NHTSA wanted and *what had been going on if, indeed, there'd been all these problems all these years*." *Id.* at 102 (emphasis added).  That is why she asked the NHTSA representative "what exactly was it that they wanted in that RFP, . . . and why did he allege that Mississippi had done something illegal." *Id.* at 103.

In sum, Boland questioned the NHTSA representative within the scope of her ordinary duties:  writing the RFP for the NHTSA-funded contracts and conferring with NHTSA regarding an issue that might affect the RFP.  As a public employee, her question was not protected by the First Amendment, and Defendants therefore did not violate her rights.[1]

B.     Tortious Interference with Employment

Under Mississippi law, "a claim for tortious interference with at-will contracts of employment is viable[.]" *Levens v. Campbell*, 733 So. 2d 753, 760 (Miss. 1999).  For a plaintiff

---

[1] Defendants also argue that they are entitled to qualified immunity as to the individual capacity claims.  The first inquiry in that analysis is whether the plaintiff has shown the defendant violated her constitutional or statutory rights. *Saucier v. Katz*, 533 U.S. 194, 201 (2001).  Boland fails to make that showing.

to prevail on a tortious-interference claim, four elements must be proven: (1) "the acts were intentional and willful"; (2) "they were calculated to cause damages to the plaintiffs in their lawful business"; (3) "they were done with the unlawful purpose of causing damage and loss, without right or justifiable cause on the part of the defendant"; and (4) "actual loss occurred." *Id.* at 760–61 (citing *Collins v. Collins*, 625 So. 2d 786, 790 (Miss. 1993)). Additionally, "[i]t must also be proven that the contract would have been performed but for the alleged interference." *Id.* at 761 (citing *Par Indus., Inc. v. Target Container Co.*, 708 So. 2d 44, 48 (Miss. 1998)).

### 1. Claim Against Defendant Fisher

Defendant Fisher says Boland's claim against him fails because, under the third element, he had a "right" to terminate her. Boland responds that Fisher acted in bad faith, and his actions were therefore unlawful.

Under the third element of a tortious-interference claim, "[a] person in a position of authority on behalf of another is privileged to interfere with the contract between his principal and another." *Courtney v. Glenn*, 783 So. 2d 162, 165 (Miss. Ct. App. 2000) (citing *Shaw v. Burchfield*, 481 So. 2d 247, 255 (Miss. 1985)). This privilege applies only if the person is "acting within the scope of that authority and without bad faith." *Id.* Mississippi courts have interpreted this privilege as "merely a specific example of having 'right or justifiable cause' to interfere with the [contractual] relationship." *Morrison v. Miss. Enter. For Tech., Inc.*, 798 So. 2d 567, 575 (Miss. Ct. App. 2001). That is, "[a] person occupying a position of responsibility on behalf of another is 'privileged,' which is another word for having a right." *Id.* And if that person acts within the scope of his or her authority, "then for the 'without right' portion of the third prong to be met, the [person] must have acted in bad faith," which means that the person

8

acted "malicious[ly] or recklessly disregard[ed] the rights of the person injured." *Springer v. Ausbern Constr. Co., Inc.*, 231 So. 3d 1065, 1069 (Miss. Ct. App. 2016).

To begin, Fisher acted within the scope of his duties as DPS Commissioner when he terminated Boland's employment. By statute, the DPS Commissioner is responsible for making DPS's staffing decisions. Miss. Code Ann. § 45-1-5. Moreover, public employees like Boland serve "at the pleasure of the governing authorities and may be discharged by such governing authorities at any time . . . without cause." *Id*. § 21-3-5; *see also* 27-2 Miss. Code R. § 2.2 (stating that "non-state service" positions like Bolands are at-will positions).

As to bad faith, Boland argues that Fisher exhibited "willful indifference," Pl.'s Resp. [47] at 12, because he neither explained why he fired her nor investigated the incident himself, *id*. at 9. To begin, Boland cites no authority suggesting that an agency head must personally investigate and convey all employment decisions. Regardless, even assuming Fisher had investigated and fully adopted Boland's version of the events with NHTSA, he could have terminated her employment because the speech was not protected under the First Amendment. In other words, Fisher could not have "malicious[ly] or recklessly disregard[ed]" Boland's rights because even assuming the events occurred as she said, she had no First Amendment rights regarding those statements. *Springer*, 231 So. 3d at 1069. Absent bad faith, Fisher was privileged to interfere with the employment contract between Boland and DPS; he had a "right" to do so. Boland cannot prevail on a tortious-interference claim against Fisher.[2]

---

[2] It is worth noting Fisher's testimony that "[t]here were a series of conduct issues" supporting his decision. Fisher Dep. [43-2] at 19. First, during "a committee meeting at the legislature" Boland "engaged in a heated discussion with a sitting judge[.]" *Id.* at 21–22, 26. She told the judge, "You stay out of this. This has nothing to do with you," after he apparently interrupted a presentation that she was giving. *Id.* at 25. Second, Boland gave a presentation to the Mississippi Judicial College; afterwards, a Mississippi Supreme Court Justice attending the presentation called DPS and asked that "she not come back again" because "the presentation was

9

2. Claim Against Defendant Sims

Sims makes a different argument, contending that he had "justifiable cause" to inform Fisher of Boland's conduct. Defs.' Mem. [44] at 12. Boland responds that Sims was hostile towards white women and therefore "the jury may infer" that he acted maliciously. Pl.'s Resp. [47] at 12.

If justifiable cause existed for Sims's actions, then, as a matter of law, he could not act with malice. *See Springer*, 231 So. 3d at 1068. While the parties describe the NHTSA meeting in slightly different ways, the stories largely overlap. Sims described Boland's conduct during the meeting with the NHTSA representative as follows:

> On that day [a NTHSA representative] was coming over to discuss the organization chart. We were—it was time to start preparing for our highway safety plan; and also we had been understaffed, so we were trying to get some positions in place. . . . During that meeting Ms. Boland came in through the door, and I waved at her. And she ended up coming into the conference room with [the representative] and I, and I introduced [the representative] to her. And the conversation started pretty well, and then she started[,] . . . it turned into a heated event at that moment where they started kind of just kind of getting a little heated. [The representative] felt offended. They both raised up, and they were talking to each other. He said, "You're being confrontational," and she said, ["]No, I'm not." And so it kind of went on, and I said . . . [Boland] . . ., "Please, just stop." . . . I asked her to let me finish the meeting with [the representative]. She left out, but she came back again to try, I guess, to see what was going on with the conversation. I don't remember exactly how it happened, but [the representative] just wasn't having it.

Sims Dep. [31-10] at 28–29. For her part, Boland agrees that the conversation became heated after she confronted the NHTSA representative. Whatever she said or how she said it, she provoked a response. According to her, the NHTSA representative "jumped up and went crazy and was screaming at [her.]" Boland Dep. [43-1] at 103. And there is no dispute in the record

---

a disaster." *Id.* at 32. Fisher also testified that Boland was fired because she "mishandl[ed] contracts" by not completing them "in a timely fashion[.]" *Id.* at 33. According to Fisher, this "accumulation of . . . issue[s]" was the basis of Boland's termination. *Id.* at 17. Boland never disputed the other incidents upon which Fisher claims to have based his decision.

10

that the NHTSA representative reported the confrontation to his director, prompting Sims to call NHTSA to apologize for Boland's behavior. Sims Dep [31-10] at 29–30.

Sims reported the incident to Fisher, who then consulted with others before deciding to let Boland go. Significantly, there is no suggestion that Sims told Fisher anything that was untrue about Boland's heated confrontation with NHTSA. And Boland has not refuted Fisher's testimony that Sims never recommended any discipline. Fisher Dep. [43-2] at 8. According to Fisher, he "discussed . . . some matters with Ray Sims, but nothing relative to any recommendations." *Id.*

Boland argues that the jury might "infer" from Sims's alleged hostility toward white women—something she did not plead in this case—that he acted without justifiable cause. But even accepting the facts regarding the NHTSA confrontation as Boland describes them, no reasonable jury could conclude that Sims lacked justifiable cause to report her. At bottom, Sims simply told his supervisor that Boland had a heated exchange with NHTSA, something Boland admits. Boland Dep. [43-1] at 103. And the undisputed record evidence—including Boland's own testimony—demonstrates that the crucial NHTSA relationship was already strained before Boland provoked the NHTSA representative. Finally, Boland offers no evidence that Sims did anything more—like recommending discipline. Because his actions were justified, Boland cannot satisfy the third element of a tortious interference claim against Sims.

IV. Conclusion

The Court has considered all arguments. Those not addressed would not have changed the outcome. For the reasons stated, Defendants Fisher and Sims's motion to dismiss [43] is

granted. All claims against Fisher and Sims are dismissed with prejudice, and they are terminated as defendants in this case.

**SO ORDERED AND ADJUDGED** this the 13th day of November, 2019.

s/ *Daniel P. Jordan III*  
CHIEF UNITED STATES DISTRICT JUDGE